# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Crim. No. 11-07-LPS |
| ARQUIMIDES INFANTE, | ) | |
| Defendant. | ) | |

## **MEMORANDUM ORDER**

## I. INTRODUCTION

On January 13, 2011, a federal grand jury returned a one-count indictment with notice of forfeiture against Arquimides Infante ("Defendant") on a charge of possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). (D.I. 10) Defendant has moved to suppress evidence[1] seized, without a warrant, from his person on December 11, 2010. (D.I. 30, 40, 42) An evidentiary hearing was conducted on September 9, 2011, at which the government presented one law enforcement witness. (D.I. 41) (hereinafter "Tr.") The matter is fully briefed. (D.I. 39, 40, 42) This Court has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. FINDINGS OF FACT

Pursuant to Federal Rule of Criminal Procedure 12(d), the following constitutes the Court's findings of fact.

1.  No later than August 19, 2010, David Hughes ("Hughes"), a Special Agent with

---

[1] The evidence Defendant seeks to suppress consists of approximately 350 grams of heroin, a cellular telephone, an identification card, and business cards.

the United States Drug Enforcement Agency ("DEA") assigned to Wilmington, Delaware, commenced an investigation into narcotics trafficking in the Philadelphia, Pennsylvania and Wilmington, Delaware areas. (Tr. at 10-13)[2] With the assistance of a cooperating defendant ("CD"),[3] Hughes' investigation had led to two arrests and a "substantial seizure of heroin." (*Id.* at 11) Hughes regarded the CD as credible and past proven reliable.[4] (*Id.* at 11-12)

2. Between August and December 2010, Hughes was in almost daily contact with the CD. (*Id.* at 9-10) The CD had the opportunity to associate with many targets of drug investigations at almost any time of day. (*Id.* at 12) Because the CD was in contact with so many investigation targets and Hughes was unable to stay in contact with him every minute of every day, Hughes issued the CD a digital recorder. (*Id.* at 12, 13) The recorder was capable of recording in-person and telephone conversations. (*Id.*)

3. On December 10, 2010, the CD informed Hughes that he was in steady contact with an individual willing to sell a large amount of heroin to a potential buyer in Delaware. (*Id.* at 14) The CD gave Hughes the seller's cellular telephone number and provided a general description, identifying the seller as, among other things, "a Hispanic male, kind of medium height, medium build." (*Id.* at 15) Hughes, however, had "no name" and "no nickname," and

---

[2]Hughes has been a DEA special agent for over 12 years and has participated in "hundreds" of arrests while working at that agency. (Tr. at 5-6) The Court finds Special Agent Hughes' testimony at the hearing to have been credible.

[3]According to Hughes, the CD, facing unspecified charges in this Court, was granted pre-trial release for the purpose of assisting DEA with the investigation that led to Defendant's arrest, as well as at least one other arrest. (Tr. at 10)

[4]Hughes has managed at least 50 cooperating sources during his tenure as a special agent with the DEA. (Tr. at 8) Based upon his training and experience, Hughes regarded the CD in this case to be trustworthy. (*Id.* at 38)

could not ascertain the seller's identify from the cellular telephone number provided to him by the CD. (*Id.*) Based upon Hughes' experience as a DEA Special Agent, it was typical for a narcotics dealer not to maintain a cellular telephone in his or her own name. (*Id.* at 57)

4. During the week and a half leading up to December 11, 2010, Hughes had been in "daily" contact with the CD, engaging in "numerous" conversations with him about arranging a sale of heroin in Delaware. (*Id.* at 10, 13) Specifically, the CD was to broker a "buy/bust" heroin transaction at Hughes' direction. (*Id.* at 14)[5] Hughes instructed the CD to inform the seller that the heroin would go to a potential customer in Delaware. (*Id.* at 15, 16) At first, the transaction was to be for 500 grams of heroin, but as "conversations progressed" the amount was reduced to 300 grams. (*Id.* at 15, 17, 18)

5. On December 10, 2010, the CD and Hughes spoke by telephone. (*Id.* at 17) Hughes believed the CD would be traveling to Delaware to conduct the sale that evening. (*Id.*) Then the CD informed Hughes that the transaction would have to wait until December 11, 2011. (*Id.* at 19) The CD also confirmed that the amount of drugs to be purchased would be 300 grams. (*Id.* at 17)

6. The next morning, December 11, 2010, the CD advised Hughes during a series of telephone calls that the transaction could occur. (*Id.* at 19-21) Hughes instructed the CD to meet him with the seller at the Delaware Service Area in Newark, Delaware, located on Interstate 95, at 11:45 a.m. (*Id.* at 21, 23, 25) The CD advised Hughes he would be driving a black BMW and the seller – whose identity was still unknown to Hughes at the time – would be a passenger in the

---

[5] A "buy/bust" involves an individual cooperating with government agents acting as a broker between a drug dealer and a would-be buyer. (Tr. at 14)

vehicle. (*Id.* at 21) Hughes specifically instructed the CD that, consistent with prior operations, he should observe the package before he began to drive to the meeting place. (*Id.* at 22-23) Upon observing a package, the CD was to contact Hughes to let him know that he and the seller were on their way; this phone call would serve as confirmation that "a package was on board." (*Id.* at 22) The term "a package" was, Hughes understood from prior discussions with the CD, code for heroin. (*Id.* at 28, 42)

7. Hughes and other government officers arrived at the designated meeting place at 11:30 a.m. (*Id.* at 25) Surveillance commenced immediately.[6] (*Id.* at 25, 26) Minutes before the Defendant's arrival, Hughes received one last call from the CD. (*Id.* at 23, 24) During this call, the CD pretended that he was calling the buyer with updates on their estimated time of arrival. (*Id.* at 24) Hughes instructed the CD to drive to an area within the Delaware Service Area by a food court, park the vehicle in this area, and meet Hughes inside the Service Area building. (*Id.* at 26)

8. Shortly before Hughes viewed the black BMW himself, Task Force Officer Pfaff ("TFO Pfaff") had radioed ahead to Hughes to state that Pfaff had observed both the CD and a passenger driving southbound on Interstate 95 in a black BMW. (*Id.* at 27) Around 11:30 a.m. at the Delaware Service Plaza, Hughes observed the black BMW arrive at the service plaza and park "facing the front . . . somewhere in the vicinity of" the food court. (*Id.*) DEA Task Force Officer Dewey Stout informed Hughes over his radio that the CD had parked the black BMW

---

[6] Other officers involved in the investigation included: "Task Force Officer Van Campen, Detective Dylan Wiggins from Newark [Police Department], Task Force Officer Randolph Pfaff from Wilmington Police Department, and Task Force [Officer] Dewey Stout from the Delaware State police." (Tr. at 25-26)

4

"directly next to Task Force Officer Stout and Task Force Officer Pfaff ." (*Id.*) At this point, TFO Pfaff observed Defendant take a dark package from the floorboard and place it into Defendant's groin area. (*Id.* at 28) TFO Pfaff observed Defendant from three feet away, as his vehicle was parked directly next to the black BMW. (*Id.* at 53) This information was relayed to Hughes over the radio prior to the arrest. (*Id.* at 53) While standing inside the service plaza, Hughes observed the CD and the seller – who matched the description previously provided to him by the CD – exit the black BMW and walk towards the food court, just as Hughes had instructed. (*Id.* at 26-27) When the CD and the seller arrived at the designated meeting location inside the building, Hughes identified himself as a law enforcement officer and immediately placed both the CD and Defendant under arrest. (*Id.* at 29) Defendant was taken to the ground and handcuffed by Hughes, Detective Van Campen, and TFO Pfaff. (*Id.* at 51) Upon arrest, Hughes recovered a package of drugs from Defendant's groin area. (*Id.* at 59)

9. At no time during any of Hughes' conversations with the CD did the CD use the word "heroin." Neither the CD nor the black BMW were searched for contraband by law enforcement prior to the CD's encounter with Defendant on December 11, 2010.

## III. LEGAL STANDARDS

When a defendant challenges the legality of a warrantless search and seizure, the burden is on the government to demonstrate, by a preponderance of the evidence, that the acts are constitutional. *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). The Court is charged with reviewing the credibility of witnesses and determining the weight to be given the evidence, together with the inferences, deductions, and conclusions to be drawn from the evidence. *See United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir.1993); *United States v.*

*Williams*, 400 F. Supp. 2d 673, 677 (D. Del. 2005).

## IV. DISCUSSION

Defendant contends that his arrest was made without probable cause, insofar as there was "no police corroboration of illegal activity being committed by [Defendant]." (D.I. 40 at 3) He argues that "leaving the confidential source to his own devices for at least one hour to corroborate the basis for the tip involving [Defendant] should be deemed insufficient as a matter of law." (*Id.*)

The Fourth Amendment of the United States Constitution requires that an arrest be supported by probable cause. "The determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the Court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed." *United States. v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984); *see also Beck v. Ohio*, 379 U.S. 89, 96 (1964). Probable cause based on "[i]nformants' tips, like all other clues and evidence coming to a policeman on the scene[,] may vary greatly in their value and reliability.' Rigid legal rules are ill-suited to an area of such diversity." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (internal quotation marks omitted).

"Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 1716 (2009) (internal quotation marks omitted); *see also United States v. Hartwell.* 436 F.3d 174, 177 (3d Cir. 2006).

One such exception is a search incident to arrest. The government may search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime. *See Mapp v. Ohio*, 367 U.S. 643, 649 (1961). A search may be incidental to an arrest "only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Stoner v California*, 376 U.S. 483, 486 (1964). "[T]he application of the test depends on the circumstances of the individual case." *United States v. Miles*, 413 F.2d 34, 40 (3d Cir. 1969).

Considering the totality of the circumstances, the Court concludes that the officers had probable cause to arrest Defendant based on a reasonable belief that he was in possession of heroin. The CD had previously proven to be reliable when he had provided information that led to two other arrests and a substantial seizure of heroin on August 19, 2010. The information gathered and recorded over a week and a half before the arrest on December 11, 2010 by the CD revealed that Defendant was willing to sell a large amount of heroin to a Delaware purchaser. A date, time, and location was set by Hughes, through the CD, in order to execute the heroin transaction. The CD did in fact arrive with Defendant, who fit the description previously provided by the CD to Hughes, precisely at the time and location directed by Hughes, while driving the vehicle that law enforcement authorities knew they would be driving (the BMW). The CD followed Hughes' instructions precisely as he directed.

The information provided by the CD was further corroborated by the observations of law enforcement officers prior to Defendant's arrest. TFO Pfaff radioed ahead to Hughes that he observed both the CD and a man who matched the description of the seller driving down Interstate 95 in the black BMW. TFO Pfaff also observed Defendant, who matched the description provided by the CD, place a dark package in his groin area just minutes before

7

Defendant was arrested.

Defendant does not contend that the search incident to his arrest was not "substantially contemporaneous." Because the Court finds that there was probable cause to arrest Defendant, Defendant "concedes by implication the legality of the search." *People v. Chiagles*, 237 N.Y. 193, 197 (1923); *see also United States v. Butenko*, 494 F.2d 593, 604 (3d Cir. 1974) ("An officer may search a person without a warrant incident to a lawful arrest or when he has probable cause to arrest in order to avert possible destruction of evidence or when there is a possibility of an attempt to use a concealed weapon to injure the officer or facilitate escape."). Thus, Defendant's request to suppress 350 grams of heroin, a cellular telephone, an identification card, and business cards will be denied.

## V. CONCLUSION

For the reasons given above, **IT IS HEREBY ORDERED** that:

1. Defendant's motion to suppress (D.I. 30) is **DENIED**.

2. A telephone status conference will be held on November 18, 2011 at 12:00 p.m., with the government to initiate the call.

3. The time between this Order and the teleconference shall be excluded under the Speedy Trial Act in the interests of justice, 18 U.S.C. § 3161, et seq.

Dated: November 10, 2011            UNITED STATES DISTRICT JUDGE